# GRANT v. PARKER.

APPEAL FROM THE CIRCUIT. COURT OF THE UNITED STATES FOR THE DISTRICT OF CALIFORNIA.

Argued April 23, 1885.—Decided May 4, 1885.

A syndicate, of which A and B were members, was formed to purchase a mine, and it was agreed before the purchase, as a condition of A's subscription, that he should "control the management of the mine." After the purchase a board of directors was organized, of which A & B were members. At a meeting of the Board, of which A had notice, resolutions were passed at the instigation of B prohibiting the treasurer from paying checks not signed by the president and vice-president, and countersigned by the secretary ; directing that all orders for supplies and materials from San Francisco should be made through the head officer there; authorizing the vice-president in the absence of the president, to sign certificates of stock and other papers requiring the president's signature ; and authorizing the superintendent of the mine, in the absence from the mine of the president, to draw on the company at San Francisco for indebtedness accruing at the mine : *Held*, That these resolutions were not inconsistent with the control of the mine by A.

The facts which make the case are stated in the opinion of the court.

*Mr. Whitaker M. Grant* for appellant, submitted on his brief.

*Mr. John Johns* [*Mr. John N. Rogers* also filed a brief] for appellee.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This is a bill in equity filed by a stockholder and director of the Fresno Enterprise Company, a California corporation owning the Enterprise mine, against another stockholder and director, to restrain him "from attending any meeting of the board of directors to enforce" certain resolutions passed at a previous meeting, "which give the vice-president authority to sign checks or certificates of stock," when the complainant, the president of the company, is "not in the city of San Francisco, or which authorize the superintendent to draw drafts on the company when" the complainant is "not at the mine," and also restraining the defendant "from voting on . . . five thousand six hundred and sixty shares of stock issued to him under the contract of 3d May, 1881, or any other shares of stock owned by him, at any meeting of the stockholders for electing directors or amending the by-laws;" and "that on the final hearing" the complainant "be decreed to have a continuing proxy for said five thousand six hundred and sixty shares."

The general ground on which the complainant seeks his relief is this:

In May, 1881, an association of capitalists, called in the bill a "syndicate," to which both the complainant and defendant belonged, bought 51,000 of the 100,000 shares of the capital stock of the company, and in the contract under which the syndicate was formed it was agreed that the complainant was "to control the management of the mine." In the purchase the complainant became the owner of 17,000 shares, and the defendant of 5,660. Other persons divided the remaining 28,340 shares between them. The 49,000 shares not purchased

were held by persons outside of the syndicate. At a meeting of stockholders, held a few days after the purchase for the election of directors, the complainant and the defendant, with one other member of the syndicate, were elected directors, as the representatives of the purchasers, and two others not in the syndicate as representatives of the minority stockholders. The complainant was elected president of the board of directors and general manager of the mine. The defendant and the directors who were elected in the interest of the minority stockholders seem to have been of opinion that some additional rules for the government of the affairs of the company were necessary, and so, as is alleged, by false representations the defendant, in December, 1881, induced some of the members of the syndicate to agree to the adoption of the following resolutions by the directors:

"*Resolved*, That the Bank of California, the treasurer of this company, be, and is hereby, instructed to pay only such checks as are signed by the president or vice-president and countersigned by the secretary.

"*Resolved*, That all orders for supplies and materials from San Francisco for the company shall be made through the head office in San Francisco, and payment for the same shall be made by checks signed by the president or vice-president and countersigned by the secretary, at the office in San Francisco.

"*Resolved*, That in the absence of the president from the office of the company in San Francisco, the vice-president, in accordance with the by-laws, be, and is hereby, authorized to sign all certificates of stock that are legally issued by the secretary, as well as all papers requiring the signature of the president, if he were present at the office.

"*Resolved*, That in the absence of the president from the mine that the superintendent at the mine be, and is hereby, instructed to draw drafts on the company at San Francisco for all indebtedness accruing at the mine."

These resolutions were adopted by the board on the 4th of January, 1882, at a regular meeting held that day, of which the complainant had knowledge, but which he did not attend. A quorum of directors was present at the meeting and the

defendant voted for the resolutions. It was to restrain the defendant from aiding the directors in the enforcement of these resolutions, and from voting his shares acquired under the syndicate contract, except in accordance with the will of the complainant, that this bill was brought.

We are unable to discover any ground for equitable relief in the case made by the bill. It is undoubtedly true that the defendant was anxious to have the complainant interested in the mine, and was willing to become one of a number of persons, of whom the complainant should be one, to purchase enough of the stock to make the aggregate of their holdings a majority of the entire capital of the company. It is also true that the defendant, and all the other members of the syndicate, yielded to the condition insisted on by the complainant that "he should have the control of the management of the mine" if the purchase of the majority of the stock was made, but this was necessarily subject to such reasonable rules and regulations as should be adopted in a proper way, either by the stockholders or the directors, for the government of the conduct of the officers of the company. No attempt has been made to remove the complainant from his office of general manager. He still "controls the management of the mine," so far as anything appears in the bill. All that the directors have done by their resolutions, of which complaint is made, is to prohibit the Bank of California, the treasurer of the company, from paying any checks of the company except such as are signed by the president or vice-president and countersigned by the secretary; to direct that all orders for supplies and materials from San Francisco should be made through the head office in San Francisco, and paid for in checks signed and countersigned as above; to authorize the vice-president to sign certificates of stock and all other papers requiring the signature of the president, when the president was away from the office, and authorizing the superintendent at the mine, in the absence of the president, to draw drafts on the company at San Francisco for debts incurred there. We see nothing in this inconsistent with the control of the mine itself by the complainant "as if he owned it."

Without, therefore,. deciding whether, if the members of the syndicate should undertake to remove the complainant from the control of the management of the mine without just cause, he could have preventive relief in equity, we affirm the decree.

*Affirmed.*